## Weber v. Salisbury, Trustee.

### (Decided June 21, 1912.)

### Appeal from Boyd Circuit Court.

1. Gifts Causa Mortis.—Where one, in anticipation of death from a mortal wound, sends for an intimate friend, and tells him that he has certain money on deposit in a certain bank, and directs him to get it and divide it equally between his wife, his mother, his son and Irma Salyers, and then signs the following order, addressed to the bank: "Please give all the money which I have on deposit with you, which is something more than $2,000, to W. M. Salisbury, who is to divide it equally between my wife, my mother, my son and Irma Salyers," and the order is then delivered to the cashier of the bank, with a statement by the person to whom the order is payable that he does not desire the money, but simply wants credit for it, and the cashier assures him that the order is all right, this will constitute a valid causa mortis.

2. Husband and Wife—Gift Causa Mortis—Fraud.—A gift causa mortis of $2,000, where the donor's wife is a donee to the extent of one-fourth thereof, is not in fraud of the wife's marital rights where the donor leaves real estate of the value of about $3,000 and other personal property worth several hundred dollars and also has his life insured for the benefit of his wife in the sum of $1,000, which is one-half, or all, that the wife, under the statute, would have been entitled to of the funds constituting the gift.

J. B. WILHOIT, J. W. WOODS and JOHN T. DIEDERICH for appellant.

FRANK C. MALIN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Frank W. Blevins was a conductor in the employ of the Chesapeake & Ohio Railway Company. He was twice married. After the death of his first wife, he married appellant, Sadie Blevins Weber, who, after his death, married the second time. There was born of the marriage between Frank W. Blevins and Sadie Blevins Weber one son, who is now about 14 years of age. About dark on the 23rd day of February, 1909, Frank W. Blevins was shot and mortally wounded at Whitehouse, Kentucky. He was carried to the King's Daughters hospital at Ashland, Kentucky, where he died about one o'clock a. m., on February 25th. At the time of his death, he owned some real estate worth about $3,000. He also had on deposit in the Citizens Bank & Trust Co., of Ashland, Ky., about $2,000, and had other personal property amounting to a few hundred dollars. He also had his life insured for the benefit of his wife in the sum of $1,000, and carried other insurance for the benefit of his mother and son. From the time he was shot, but little hope was entertained for his recovery. On February 24th, he became alarmed about his condition, and sent for Dr. Salisbury, an intimate friend. Dr. Salisbury had for a number of years practiced medicine in Ashland, and for a few years prior to the homicide had been engaged in various business enterprises. Drs. G. W. Moore and J. M. Salmon were the attending physicians, and Dr. Salisbury was sent for to consult with them. Dr. Salisbury arrived at the hospital at about one o'clock p. m., February 24th. When he first arrived, neither Dr. Moore nor Dr. Salmon was there. Dr. Salisbury examined Mr. Blevins and told him he could not get well. While there Mr. Blevens requested the nurse to go out of the room and to keep everyone else out. Blevins then turned to Dr. Salisbury and said: "Doc, I have some money down at the Citizens Bank, and I want you to get it and I want you to give my mother one-fourth of it; my son one-fourth of it; give my daughter one-fourth of it, and give my wife the remaining fourth." In speaking of his daughter, he referred to Irma Salyers. Dr. Salisbury then requested him to put his request in writing and let Dr. Salmon and Dr. Moore, who would be there presently witness it. At the same time he told Blevins that he would do it for him. Blevins then said: "I believe

you will carry out what I want done." When Drs. Moore and Salmon arrived, Dr. Salmon wrote out the following order, which was signed by Blevins and witnessed by Drs. Salmon and Moore.

"Ashland, Ky., Feb. 24th, 1909.
"To the Citizens Bank & Trust Co.,
                                        Ashland, Ky.
     "Please pay all the money which I have on deposit with you, which is something more than two thousand dollars, to W. M. Salisbury, who is to divide it equally between my wife, my mother, my son and Irma Salyers.
               (Signed)               "F. W. BLEVINS."
"Witnessed by
     "J. M. SALMON,          (Signed)
     "GEO. W. MOORE."        (Signed)

     After Blevins had signed the order, he told Dr. Salisbury that his bank book was at home in the bureau drawer, wrapped up in blue tissue paper, and had the picture of his girl wrapped up with it. He further said: "Go get that and bring it to me, provided they will not accept that order." After getting the order, Dr. Salisbury carried it to the Citizens Bank & Trust Co., and presented it to Mr. Head, the cashier. Mr. Head told Dr. Salisbury that Mr. Blevins had on deposit about $2.015. At the time Dr. Salisbury went to the bank, it was open, and it was between two and three o'clock. When the order was presented to Mr. Head, "he looked at it, and said it was all right. He said that it ought to have been written on a regular form, but it would be all right." Mr. Head also inquired if Mr. Blevins was in immediate danger. Dr. Salisbury told Mr. Head that if it was not all right, he wanted to know, so that he could make it all right. At the same time, he said to Mr. Head: "I don't want this money, but if this man dies I want to know if I can get the money. I want to dispose of this money to the persons he wanted to have it." Dr. Salisbury left the order with Mr. Head at the time, and it was in the possession of the bank when the trial took place. After delivering the order to Mr. Head, Dr. Salisbury returned to the hospital and advised Mr. Blevins that the bank had accepted the order. Blevins died that night about one o'clock and the bank declined to pay the money.
     Drs. Salmon and Moore fully corroborate Dr. Salisbury.

Mr. J. S. Head, the cashier of the Citizens Bank & Trust Co., testifies that Dr. Salisbury called at the bank on the afternoon of February 24th, after banking hours. According to his best recollection, he told Dr. Salisbury that the order looked like it was all right, but that he could not pay it until he had seen Mr. Boggess, and that he could not pay it at all that day, as the safe was closed. Dr. Salisbury said that he did not want the money, but that he would take credit for it. Head then told him that he could not do that until he had seen Mr. Boggess. Mr. Boggess afterwards came in, and upon looking at the order, said he would have to see his attorney about it. Before Dr. Salisbury came, someone telephoned Mr. Head that the doctor would be there. While Mr. Head says that the bank was closed at the time, he admits that they frequently cashed checks and took in deposits after banking hours. No transfer of Blevins' account was made to Dr. Salisbury.

After Blevins' death, Dr. Salisbury brought this action against the Citizens Bank & Trust Co., individually, and against it as administrator of Frank Blevins. Subsequently the bank resigned as administrator, and its president, Mr. Boggess, was appointed in its stead. During the pendency of this proceeding, Sadie Blevins Weber, who at the time of his death was the wife of Frank W. Blevins, was made a party, and attacked the gift on the ground that the gift was invalid, and even if valid, was in fraud of her marriage rights. Judgment was rendered in favor of Dr. Salisbury as trustee, and from that judgment Sadie Blevins Weber alone appeals.

The evidence in this case leaves no doubt that Frank W. Blevins realized that he was mortally wounded, and that his end was near. He wished that the money on deposit with the Citizens Bank & Trust Co. should be distributed equally between his wife, his son, his mother and Irma Salyers. He not only indicatd this by his parol declarations to Dr. Salisbury, his intimate friend, but by the written order which he subsequently signed in the presence of Drs. Moore and Salmon. At the time he did this, his mind was perfectly clear. So anxious was he to consummate the arrangement that he enjoined Dr. Salisbury to report to him whether or not the bank would accept the order, and if not, to get the pass book, which was not in his possession but was at his home some distance away.

For appellant it is first insisted that Dr. Salisbury

was simply the agent of the donor, and that even if there was sufficient delivery to the agent, the title to the property remained in him, as there was never any delivery to the donee. The rule is, however, that unless the contrary appears, it will be presumed that the person to whom the delivery was made takes as the trustee of the donee. Devol v. Dye, 123 Ind., 321, 7 L. R. A., 429, 24 N. E., 246; Johnson v. Colley, 101 Va., 414, 99 Am. St. Rep., 884, 4 S. E., 721; 14 Am. & Eng. Enc. of Law, p. 1061; Varley v. Sims, 8 L. R. A., 828. While it is true that in a sense Dr. Salisbury was the donor's agent, yet he was likewise the trustee of the donees, to carry into effect the trust imposed upon the property in question. The rule in regard to delivery is that there must be an actual, constructive or symbolical delivery of the property in question in order to make it a valid gift causa mortis. This, however, does not always mean that there must be the manual transfer of the property. The rule is that the delivery must be according to the nature of the thing, and actual delivery so far as the subject is capable of delivery. If actual delivery be impracticable, then there must be some act equivalent to it. Brown v. Brown's Admr., 4 B. Mon., 535. In this case, the money was not in the donor's possession, but was in the bank. He did not even have his pass book with him. Therefore, he made the only delivery of the money that he could make under the circumstances. But it is insisted that the order in question was merely a check, which was not paid or accepted by the bank, and was, therefore, revoked by the donor's death. We are not inclined, however, to apply the technical rule in regard to checks for the purpose of defeating a donor's intention. Strictly speaking, the order was not a check. It was not negotiable; it was not for a sum certain. The order was something more than a mere check. It was not only an order on the bank to pay the money to Dr. Salisbury, but appointed Dr. Salisbury trustee to carry out the intention of the donor. We do not attach any great importance to the fact that the bank did not make an assignment of the deposit on its books. The cashier's recollection of the transaction seems to be somewhat vague and uncertain. He evidently stated to Dr. Salisbury that the order was all right. He admits having said that it looked all right. The exact words which he used to Dr. Salisbury were sufficient to cause the latter to return to the donor and tell him that the order was all right. Under these circumstances we con-

clude that there was an equitable assignment of the funds to Dr. Salisbury in trust for the four donees. Having received the order and kept it in his possession, and having assured Dr. Salisbury that the order was all right, the purpose of the donor will not be defeated by the bank's subsequent refusal to transfer the funds on its books to Dr. Salisbury.

When we consider the size of the donor's estate, and the fact that his wife was made the donee of one-fourth of the gift, and that the donor had his life insured for her benefit in the sum of $1,000, which is one-half, or all that she, under the statute, would have been entitled to, of the funds in question, we see nothing in the facts of this case from which it could be reasonably inferred that the donor, by the gift in question, intended to perpetrate a fraud on his wife.

Judgment affirmed.